UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE THE APPLICATION OF HEITOR FERREIRA DA COSTA,<br><br>Plaintiff/Petitioner,<br><br>v.<br><br>JESSICA CAMILA ALBEFARO DE LIMA,<br><br>Defendant/Respondent. | *<br>*<br>*<br>*<br>*<br>*<br>*      Civil Action No. 22-cv–10543-ADB<br>*<br>*<br>*<br>*<br>* |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

BURROUGHS, D.J.

  Heitor Ferreira da Costa ("Petitioner" or "Ferreira da Costa") filed a petition for the return of his six-year-old son, T.F.,[1] to Brazil, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention" or "Convention"), as implemented by the United States by the International Child Abduction Remedies Act ("ICARA").  T.F.'s mother, Jessica Camila Albefaro de Lima ("Respondent" or "Albefaro de Lima"), with whom T.F. is currently living in Martha's Vineyard, Massachusetts, opposes the petition, arguing that T.F. was not wrongfully removed from Brazil, within the meaning of the Hague Convention, and that even if Petitioner can make that *prima facie* showing, T.F. should not be returned to Brazil, because T.F. is well-settled in his new environment and returning him to Brazil would put him at a grave risk of harm.

---

[1] To protect the child's privacy, the Court refers to the child as "T.F."

## I.      PROCEDURAL HISTORY

Ferreira da Costa filed his petition in this Court on April 11, 2022.  [ECF No. 1].

Following some motion practice, the Court conducted a three-day bench trial on February 8,

February 9, and February 13, 2023, during which it heard testimony from both parties,

Petitioner's mother and Petitioner's family friend, Respondent's mother and brother, and T.F.'s

kindergarten and Bible study teachers.

The Court now makes the following findings of fact and conclusions of law in

accordance with Federal Rule of Civil Procedure 52(a).

## II.     THE HAGUE CONVENTION

Over one hundred countries—including both the United States and Brazil—have signed

the Hague Convention on the Civil Aspects of International Child Abduction.[2]  Those countries

"desir[e] to protect children internationally from the harmful effects of their wrongful removal or

retention and to establish procedures to ensure their prompt return to the State of their habitual

residence, as well as to secure protection for rights of access."  Hague Convention on the Civil

Aspects of International Child Abduction pmbl., Oct. 25, 1980, T.I.A.S. No. 11670, 1343

U.N.T.S. 89.  "Broadly speaking, the Convention aims to deter parents from abducting their

children to a country whose courts might side with them in a custody battle."  Díaz-Alarcón v.

Flández-Marcel, 944 F.3d 303, 305 (1st Cir. 2019).

Under the ICARA, 22 U.S.C. § 9001 *et seq.*, which implemented the Hague Convention:

> Any person seeking to initiate judicial proceedings under the Convention for the
> return of a child or for arrangements for organizing or securing the effective
> exercise of rights of access to a child may do so by commencing a civil action by
> filing a petition for the relief sought in any court which has jurisdiction of such

---

[2] See Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited June 2, 2023).

action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

Id. § 9003(b). The purpose is to "restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum." Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000).

The Convention does not empower the Court to make any determinations regarding child custody. See 22 U.S.C. § 9001(b)(4). The Court is tasked solely with determining whether that custody decision should be made here in the United States or by T.F.'s country of habitual residence, Brazil. See id. "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest." Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015). Therefore, "children who have been wrongfully removed from their country of habitual residence must be returned, unless the abductor can prove one of the defenses allowed by the Convention." Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002).

III.     **FINDINGS OF FACT**

    A.     **The Parties' Early Relationship and the Child's Life in Brazil Before the Parties' Divorce**

Petitioner and Respondent are both citizens of Brazil. They met in February 2010 in Sao Sebastiao do Anta, Respondent's hometown, in the State of Minas Gerais, Brazil. They dated for approximately six years before getting married on August 12, 2016. T.F. was born a few months later, in October 2016.

After T.F. was born, the parties, T.F., Respondent's older son, and Respondent's mother lived together, in Sao Sebastiao do Anta, a city in the State of Minas Gerais, Brazil. Since 2017, Petitioner has been employed as a military police officer. During the parties' marriage, Respondent did not work outside the home. Petitioner stated that he was involved in T.F.'s care

when he was young, helping to bathe T.F. and changing his diapers, but Respondent has been T.F.'s primary caregiver for his entire life.  Petitioner described Respondent as an excellent mother.

In May 2017, when Petitioner was transferred for work, the parties, T.F., and Respondent's older son moved to Maio Azul, also in Minas Gerais, and lived with Petitioner's mother and other members of his family.  Maio Azul is approximately 140 kilometers, or two hours by car, from the parties' and T.F.'s previous home in Sao Sebastiao do Anta.

In March 2018, the parties separated.  While Petitioner testified that the separation was sudden, Respondent credibly testified that issues existed in their relationship long before T.F. was born and continued thereafter.  Respondent also testified that she and Petitioner had separated once before, sometime after August 2017, and reconciled, before separating again in March 2018.  Respondent, T.F., and Respondent's older son moved back in with Respondent's mother in Sao Sebastiao do Anta.  T.F. was approximately a year and half at the time of the parties' permanent separation in March 2018.

**B.      The Parties' Divorce and the Child's Life in Brazil After the Parties' Divorce**

Respondent filed for divorce in June 2018. In October 2018, the parties reached a divorce agreement, which addressed, as relevant here, custody and visitation of T.F.  A Brazilian court entered judgment approving the terms of the parties' agreement ("Divorce Agreement") on December 19, 2019.[3]  The parties agreed that Respondent would have "definitive custody" of T.F. and Petitioner would have "liberal visitation."  The Divorce Agreement included the following relevant provisions:

- "In relation to the son of the concordants [sic] . . . it is agreed between the parties that he will remain under the custody of the mother, that is, the definitive custody will be with

---

[3] The Divorce Agreement is written in Portuguese, but the parties have provided the Court with a translation, and stipulated to facts concerning its contents.

the mother . . . and the Defendant (father) may make free visits to the minor, provided that previously agreed / communicated between the parties."

- "it will be up to the Defendant (male), the exercise of the right of visits, and must pick up the minor child, once a month, at 9 o'clock on Saturday and return [him] at 21 o'clock on Sunday, at the residence of the Applicant (mother)."

- "On municipal, state and national holidays, the child will stay alternately, one with the Defendant and the other with the Applicant from the third year of the minor."

- "As soon as the minor reaches the 03 (three) years of age, the first and the third weekend, the minor will stay with the mother, the second and fourth weekend, the minor will stay with the father, and in the case of a fifth weekend, the stay with the minor will occur alternately, for this, the Defendant (father) must pick up the minor child at 9 o'clock on Saturday and return it at 21 o'clock on Sunday, at the residence of the Applicant (mother)."

- "On weekdays, the Defendant (father) may visit the minor as long as there is prior communication with the Applicant (mother)"

- "With regard to school holidays, when the minor is studying, the Applicant and the Defendant will exercise equal custody of the minor."

Petitioner recalls that he did not see T.F. again until May 2018, two months after the separation, although he testified that he tried to see T.F. several times before that. Petitioner further testified that Respondent made it difficult for him to see T.F. in the several months after their separation, although Respondent disputes this. Over the next six or so months, from May 2018 to October 2018, Petitioner generally saw T.F. twice a month. Even once the parties reached the Divorce Agreement in October 2018, Respondent testified that Petitioner saw T.F. relatively infrequently, and although the Divorce Agreement allowed Petitioner to take T.F. for overnight visits once a month during this time, their visits typically lasted about an hour. After T.F. turned three in October 2019, Petitioner had two overnight visits with T.F., both in November 2019. Petitioner has not seen T.F. in person since November 2019.

Petitioner made child support payments to Respondent, pursuant to the Divorce Agreement. Respondent was not working when the parties separated. The child support

payments were not enough to live on, but she was not able to find a job.  Respondent's mother, with whom she was living in Brazil, and her father and brother, who were both living in the United States, provided her financial support during this time.  Prior to the parties' separation, Respondent's father had also encouraged the parties to visit the United States to see if they would like to move.  Respondent's decision to move to the United States was motivated, at least in part, by the fact that she could not find a job in Brazil.  Respondent stopped making his child support payments in early 2020, around the time he was unable to locate Respondent.

### C.   Respondent and the Child's Travel to the United States

Respondent and T.F. first attempted to enter the United States in October or November 2019.  They were detained by U.S. immigration officials, before being removed to Brazil. Respondent and T.F. entered the United States again in or around December 2019.  They were detained again for a short period of time, before being released into the United States. Respondent's older son and his father also traveled to the United States in late December 2019. Around this time, Petitioner had trouble reaching Respondent and he came to understand that she had left her mother's house in Brazil, but did not know that she had left the country.  Since December 2019, Respondent, T.F., and Respondent's older son, have resided in Martha's Vineyard.

In early 2020, although she and T.F. were already living in the United States, Respondent told Petitioner that she was living in Sao Paolo.  By August 2020, Petitioner knew that Respondent and T.F. were in the United States because she was using a U.S. cell phone provider. Around that time, Respondent told Petitioner she would not return to Brazil until November 2020, and Petitioner started to research how to bring T.F. back home.  In late 2020, Petitioner contacted various people, including judges and lawyers, to determine how to secure T.F.'s return to Brazil.

In August 2021, Petitioner filed an application for the return of T.F. to Brazil with the Brazilian Ministerio da Justica, Secretaria Nacional de Justica, Departamento de Recuperação de Ativos e Cooperação Jurídica Internacional, Autoridade Central Administrativa Federal, which is Brazil's designated Central Authority pursuant to the Hague Convention.  Respondent stated he delayed in filing this action mainly due to circumstances related to the COVID-19 pandemic.  As noted above, Petitioner filed the instant petition on April 11, 2022.

D.      **The Child's Life in Massachusetts**

Since December 2019, from the time T.F. was just over three years old, T.F. has lived on Martha's Vineyard with Respondent and Respondent's older son, T.F.'s half-brother.  They have moved several times, though all within Martha's Vineyard.  More specifically, Respondent, T.F., and Respondent's older son lived in a house with Respondent's mother, father, and brother, T.F.'s grandparents and uncle, from December 2019 to September 2020.  They moved from this house in September 2020 because the landlord sold it and into a second home where they stayed there until March 2022.  They moved from this house because the landlord asked for the house back.  Although not entirely clear from the trial testimony, it appears that Respondent, T.F., and T.F.'s half-brother then moved to a third home from March 2022 to September 2022, before moving to their current apartment.  For several months between March and September 2022, T.F.'s grandmother moved to Everett, Massachusetts, and T.F. and his half-brother spent several days with her there during that time.  The current apartment where Respondent, T.F., and T.F.'s half-brother reside is a two bedroom, with a living room, kitchen, and bathroom.  T.F. shares a room with his half-brother.  Respondent pays rent monthly and renews their lease annually. Their current lease term goes through November 2023, and Respondent testified that she sees no reason why they would not renew it.  The apartment is a five-minute walk from T.F.'s school and

a five-minute drive from her older son's school.  It is also close to Respondent's brother and mother and father's houses.

Respondent works as a housepainter, typically 45 to 50 hours a week.  She also does manicures and personal training, by appointment.  She testified that she has not had trouble finding work on Martha's Vineyard.  She makes enough money to pay her rent and for her and her children's living expenses.  Family members have also loaned her money in the past, which she has been able to repay.

T.F. started kindergarten in September 2022.  Respondent takes him to school every day, and in the afternoon, he is picked up by Respondent, his grandfather, or his uncle.  After school, T.F.'s grandmother watches him until Respondent picks him up in the evening.

T.F. started school with very limited English because he and his family members generally speak Portuguese at home.  At school, T.F. and several other students meet with an English Language Learning ("ELL") teacher daily, and T.F. practices his English at home with his uncle, his half-brother, and Respondent.  Respondent has also been taking English classes since September 2022.  As of the trial, in February 2023, T.F.'s English skills had improved.  He still confuses words, and is working on vocabulary, but he talks in much more complete sentences than he used to and is even able to tell jokes in English.

More generally, T.F.'s teacher described him as engaged and eager to learn.  She testified that he notices everything and cares about his classmates and his teachers.  He gets along very well with other students, and even looks out for them.  Recently, when T.F. overheard one classmate tell another girl that she would not play with her at recess, T.F. turned to that girl and said he would play with her.  An hour later, when it was time for recess, T.F. waited for her at

the doorway of her classroom, and his teacher recalls him saying, in English, something like: "Okay, come on, let's go out and play."

Respondent is able to communicate with T.F.'s teacher through an app, though she has utilized it relatively infrequently. Respondent was unable to attend a parent conference in October, and has otherwise not met T.F.'s teacher, received an update on T.F.'s progress in January 2023. She communicates with the school's interpreter more frequently.

T.F. also attends church. Respondent started going to this church in 2021, and has recently started attending more regularly with T.F. and her older son. Over the last three to six months, T.F has attended a Bible study class on Thursdays and a children's mass on Sundays, all of which are in Portuguese. In the winter of 2023, Respondent enrolled T.F. in swimming lessons at the local YMCA.

T.F. did not attend preschool before starting kindergarten. Respondent looked into it, but was not able to enroll him because of school closures due to COVID-19 and the expense. Instead, while Respondent worked during the day, T.F. would stay with his grandmother or a family friend who has a child that T.F. gets along well with. She also taught T.F. at home in lieu of attending a formal preschool. In the summer, Respondent and T.F. did a lot of outdoor activities, including going to the beach, the park, and swimming.

On March 29, 2021, Respondent filed an application for asylum on behalf of herself and T.F. The master hearing for that proceeding is set for March 19, 2024, and no date for the final hearing has been set. On or about June 17, 2022, Respondent filed an application for employment authorization which was granted on September 8, 2022 and will expire September 7, 2024.

Since coming to the United States, T.F. has spoken with Petitioner over the phone regularly.  He has had minimal contact with Petitioner's family, his paternal grandparents and aunts and uncles.

## IV.     CONCLUSIONS OF LAW

Respondent argues that Petitioner has failed to make the required *prima facie* showing that the child was wrongfully removed, [ECF No. 36 at 13–15], but that even if a *prima facie* case has been made out, several exceptions apply.  In terms of exceptions, Respondent claims, first, that T.F. should not be returned to Brazil because the petition was filed more than one year after his alleged wrongful removal, and he is "now well settled in the United States" [id. at 21–30], and second, that returning T.F. to Brazil would put him at a "grave risk of harm," [id. at 30–32].  For the reasons discussed below, the Court will not order T.F.'s return to Brazil.

### A.     Legal Standard

"A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal," by demonstrating, "by a preponderance of the evidence," that he "(1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights,"  Mendez, 778 F.3d at 343 (citing 22 U.S.C. § 9003(e)(1)(A); then citing Sánchez-Londoño v. Gonzalez, 752 F.3d 533, 539 (1st Cir. 2014); then citing Hague Convention, art. 3; and then citing Sánchez-Londoño, 752 F.3d at 539–40).  If the petitioner can satisfy these three elements, and "commenced judicial or administrative proceedings within one year of the date of wrongful removal," the Court must order the return of the child unless the respondent can establish the existence of one of the exceptions or defenses enumerated by the Convention.  Mendez, 778 F.3d at 343.  Because "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed

10

child," "[e]xceptions to the general rule of expedient return . . . are to be construed narrowly."

Danaipour, 286 F.3d at 13–14 (citations omitted).  Respondent has the burden of establishing, by

a preponderance of the evidence, that the child is well-settled in his new environment, see Hague

Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B), or by clear and convincing evidence, that

returning the child to the country of habitual residence would pose a "grave risk" to the child's

safety, see Hague Convention, art. 13b; 22 U.S.C. § 9003(e)(2)(A).  Even if one or both of these

exceptions are satisfied, the Court still has discretion to order the return of the child.  Danaipour,

286 F.3d at 14.

### B.    Petitioner's *Prima Facie* Case

Respondent concedes that Brazil was T.F.'s country of habitual residence, but disputes

that Petitioner had custody rights immediately prior to T.F.'s removal, and that he was exercising

those custody rights.  [ECF No. 36 at 8].

> [U]nder the Hague Convention, rights of custody include rights relating to the care
> of the child and the right to determine the child's place of residence.  Rights of
> custody are distinguished from "rights of access," with the Hague Convention
> defining the latter as "the right to take a child for a limited period of time to a place
> other than the child's habitual residence."[4]

Kufner v. Kufner, 519 F.3d 33, 39 (1st Cir. 2008) (quoting Hague Convention, art. 5).  Further,

in Abbott v. Abbott, the Supreme Court held that a *ne exeat* right, that is, "the authority to

consent before the other parent may take the child to another country," is a right of custody

within the meaning of the Hague Convention.  560 U.S. at 5, 8–9.  "Rights of custody 'may arise

---

[4] "The Convention provides no return remedy when a parent removes a child in violation of a
right of access but requires contracting states 'to promote the peaceful enjoyment of access
rights.'"  Abbott v. Abbott, 560 U.S. 1, 13 (2010) (quoting Hague Convention, art. 21).  "For
example, a court may force the custodial parent to pay the travel costs of visitation or make other
provisions for the noncustodial parent to visit his or her child."  Id. (citations omitted).

in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the] State.'" Aredes v. Aredes, No. 22-cv-10666, 2022 WL 2235853, at *11 (D. Mass. June 22, 2022) (quoting Hague Convention, art. 3). "Custody is determined by the law of country in which the child was habitually resident." Mendez v. May, 85 F. Supp. 3d 539, 554 (D. Mass.) (citing Hague Convention, art. 3(a); and then citing Whallon v. Lynn, 230 F.3d 450, 456 (1st Cir. 2000)), rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015).

As the parties stipulated, the Divorce Agreement gave Respondent "definitive custody" of T.F. and Petitioner "free visits." The Divorce Agreement also provided that when T.F. turned three years old, which occurred several months before he and Respondent left for the United States, T.F. would stay with Petitioner every other weekend. Petitioner asserts this provision gives him "custody" of T.F. on those weekends. [ECF No. 37 at 8]. Further, Petitioner asserts that "as joint custodian [he had the right] to determine [T.F.'s] place of residence." [Id. at 9]. It appears that Brazilian law may give both parents the right to determine the child's residence. See Filho v. de Albuquerque, No. 20-cv-01421, 2020 WL 9455201, at *8–9 (D. Colo. Aug. 21, 2020) ("[T]he Brazilian Civil Code, Chapter V, Section II, article 1.634, grants each parent the right to participate in the determination of their child's permanent residence. Thus, as explained by petitioner's expert witness[,] [the father] had a right equal to that of [the mother] to permit or to deny a change of [the child's] residence to the United States."). Finally, at least prior to signing their Divorce Agreement, Respondent appeared to believe that Petitioner's authorization was required to get T.F. a passport, suggesting Petitioner had a *ne exeat* right.

Petitioner, however, failed to present any evidence on this point at trial, other than providing the Court a copy of the Divorce Agreement. See De Vasconcelos v. De Paula Batista,

No. 10-cv-00628, 2011 WL 806096, at *3 (E.D. Tex. Mar. 1, 2011), <u>R. & R. adopted</u>, No. 10-cv-00628, 2011 WL 4591965 (E.D. Tex. Sept. 30, 2011) ("Petitioner has argued that the United States Supreme Court's opinion in <u>Abbott v. Abbott</u> directs this Court's decision here. The Court disagrees. . . . Unlike the petitioner in <u>Abbott</u> who showed that Chilean law granted him a right to decide his child's country of residence, Petitioner here has not established that he had any *ne exeat* rights as to [his child] under Brazilian law."), <u>aff'd sub nom.</u> <u>Vasconcelos v. Batista</u>, 512 F. App'x 403 (5th Cir. 2013).  As such, it is not clear to the Court that Petitioner has carried his burden on this issue, or his *prima facie* case more generally.

Nevertheless, even assuming arguendo that Petitioner had shown by a preponderance of the evidence that he had custody rights, was exercising those rights,[5] and that T.F. was taken from Brazil in violation of those rights—which the Court finds cannot be determined without a more thorough presentation on Brazilian law and Petitioner's specific rights thereunder—the Court finds the settled child exception to removal applies here.

### C.      The Settled Exception

Pursuant to Article 12 of the Hague Convention, when a child has been wrongfully removed, he must be returned to his home country if a court where the child is located receives a

---

[5] Assuming Petitioner's rights were custody rights, he appears to have been exercising them.

> Courts in the United States "liberally find 'exercise' [of custody rights] whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  Thus, courts only find a "failure to exercise custody rights on the part of someone with such rights where there were actions that constitute[d] clear and unequivocal abandonment of the child."

<u>Karim v. Nakato</u>, No. 21-cv-11458, 2022 WL 1597955, at *11 (D. Mass. May 20, 2022) (quoting <u>Mendez</u>, 85 F. Supp. 3d at 555).  Petitioner's contact with T.F., including several overnight visits in the month prior to his departure to the United States, clearly did not constitute "unequivocal abandonment."

petition for his return within one year of the wrongful removal.  Hague Convention, art. 12; <u>see also</u> <u>Lozano v. Montoya Alvarez</u>, 572 U.S. 1, 5 (2014).  If the proceeding commences more than a year after wrongful removal, the court "shall also order the return of the child, unless it is demonstrated that the child is now settled in [his] new environment."  Hague Convention, art. 12; <u>see also</u> <u>Lozano</u>, 572 U.S. at 5.  Even if a court finds that a child is settled, it retains the discretion to nonetheless order the return of the child.  <u>See</u> <u>Yaman v. Yaman</u>, 730 F.3d 1, 13 (1st Cir. 2013).

    **a.**    **Commencing Proceeding More than a Year after Wrongful Removal**

With respect to a child located within the United States, ICARA, 22 U.S.C. § 9003(f)(3), defines "commencement of proceedings" as "the filing of a petition in accordance with" subsection (b) of 22 U.S.C. § 9003.  Section 9003(b), in turn, requires a person seeking to initiate judicial proceedings to "commenc[e] a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action . . . in the place where the child is located at the time the petition is filed."  22 U.S.C. § 9003(b), (f)(3); <u>see</u> <u>Moura v. Cunha</u>, 67 F. Supp. 3d 493, 499 (D. Mass. 2014).  As such, only the filing of a civil action in a court where the child is located is sufficient to commence Hague Convention proceedings; filing an application with the central authority of the country of origin, as Petitioner did here, does not suffice.  <u>Monzón v. De La Roca</u>, 910 F.3d 92, 99 (3d Cir. 2018) (proceedings were "commenced" when action was filed in U.S. court where child was located, not when petitioner filed application with Guatemala's Central Authority); <u>Blanc v. Morgan</u>, 721 F. Supp. 2d 749, 762–63 (W.D. Tenn. 2010) (filing action with French court and French administrative authority did not "commence" proceedings within meaning of Article 12); <u>Muhlenkamp v. Blizzard</u>, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. 2007) ("The petition must be filed with the court of record, not the Central Authority, to

file within the one-year limitation."); see Wojcik v. Wojcik, 959 F. Supp. 413, 418 (E.D. Mich. 1997) (petitioner's application to U.S. Central Authority not sufficient to trigger "commence[ment]" of "judicial or administrative proceedings").

As to the date of "wrongful removal," which establishes the date when the one-year period begins to run, courts have reached differing conclusions.  In some cases, courts have held that the one-year period starts when the agreed upon date for a child's return has passed, see, e.g., Falk v. Sinclair, 692 F. Supp. 2d 147, 162 (D. Me. 2010), or the date a petitioner is on notice that a temporary trip to another country has become permanent, see, e.g., Gonzalez v. Nazor Lurashi, No. 04-cv-01276, 2004 WL 1202729 (D.P.R. May 20, 2004), R. & R. adopted sub nom. Gonzalez Locicero v. Nazor Lurashi, 321 F. Supp. 2d 295 (D.P.R. 2004); Dietz v. Dietz, 349 F. App'x 930, 933 (5th Cir. 2009).  Other courts have held that the one-year period begins on the date a petitioner's specific custody rights were first breached, when, for example, the child was taken outside of the country for any period of time without the other parent's approval.  See, e.g., Flores Castro v. Hernandez Renteria, 971 F.3d 882, 889 (9th Cir. 2020). Here, Respondent brought T.F. to the United States, without Petitioner's consent, in October 2019 and then again in December 2019.  Additionally, Petitioner stipulated that he knew T.F. was in the United States by August 2020 and was aware Respondent did not intend to return with T.F. to Brazil by late 2020.  Petitioner ultimately filed his petition in this proceeding, in April 2022.  That petition was thus filed more than one year after any of the potentially controlling dates.  Further, this "1-year period in Article 12 of the Hague Convention is not subject to equitable tolling."  Lozano, 572 U.S. at 18 (affirming Second Circuit's judgment that respondent parent's alleged concealment of child did not equitably toll one-year requirement); see also Yaman, 730 F.3d at 16 (same).

Given the late filing of the petition, the Court will consider whether T.F. is "settled" in his new country.  See Hague Convention, art. 12 (judicial authority "shall . . . order the return of the [wrongfully removed] child, unless it is demonstrated that the child is now settled in [her] new environment"); Darin v. Olivero-Huffman, 746 F.3d 1, 20 n.27 (1st Cir. 2014) (recognizing "now-settled" defense).

### b.    Whether the Child is Now Settled

"Courts look to the totality of the circumstances in determining whether a child is now settled." da Silva v. de Aredes, 953 F.3d 67, 75 (1st Cir. 2020) (citing Yaman, 730 F.3d at 9) (further citation omitted).  Factors considered in this evaluation include:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

Moura, 67 F. Supp. at 499 (quoting In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)); see also Karim, 2022 WL 1597955, at *16 (citing Moura, 67 F. Supp. 3d at 499) (same).

"Courts also consider the amount of time a child has spent in the country, as well as their academic performance, social networks and relationships, and, under some circumstances, country of citizenship."  Moura, 67 F. Supp. 3d at 500  (citations omitted).  "A court may consider any relevant fact, including immigration status." da Silva, 953 F.3d at 75.  "Although all of these factors, when applicable, may be considered in the 'settled' analysis, ordinarily the most important is the length and stability of the child's residence in the new environment." Moura, 67 F. Supp. 3d at 500 (quoting In re B. Del C.S.B., 559 F.3d at 1009).

The Court finds that Respondent has established by a preponderance of the evidence that T.F. is well settled.  T.F. has been in this country for over three years.  He left Brazil when was

just over three years old, and has been in the United States, on Martha's Vineyard, for over half his life.[6]  Further, at the time of the trial, T.F. was 6 years old, which is clearly "old enough to allow meaningful connections to the new environment to evolve."  Zuker, 2 F. Supp. 2d at 141 (quoting In re Robinson, 983 F. Supp. 1339, 1345 (D. Colo. 1997)) (finding four-year old was settled in United States); Amdamaskal v. Amdamaskal, No. 17-cv-04961, 2018 WL 3360767, at *5 (D. Minn. July 10, 2018) (holding that "children [who] were 11 and 6 years old [were] old enough to form relationships and emotional ties to the community" and were well-settled); In re Robinson, 983 F. Supp. at 1346 (finding six and ten-year-olds were settled); Van Driessche v. Ohio-Esezeoboh, 466 F. Supp. 2d 828, 848 (S.D. Tex. 2006) (finding "six year[] old [who] ha[d] been continually residing in Houston for two-thirds of her life [and] . . . lived with her mother and her aunt at one location for more than two years, lived in another location for a short time, and recently moved to a third location [with] her mother" was well-settled).

T.F. has strong relationships and significant contact with his maternal family members in the United States, including his half-brother, who he has lived with since arriving here, his grandmother and his uncle, who he sees nearly every day, and his grandfather, who he also sees frequently.  T.F. started kindergarten in September 2022, his attendance has been consistent, and he is, by all accounts, very engaged.  He has formed connections with his teachers and gets along well with his classmates.  He is also learning English.  While he still has much to learn, he is

---

[6] In the context of determining children's habitual residence, courts have held that a "short period of time," even a matter of months not years, "can be quite significant in the life of a young child." Zuker v. Andrews, 2 F. Supp. 2d 134, 141 (D. Mass. 1998), aff'd, 181 F.3d 81 (1st Cir. 1999); Falls v. Downie, 871 F. Supp. 100, 102 (D. Mass. 1994) (finding two-year old living in the United States for eight months had "become completely accustomed to life in this country with his father and grandparents"); Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995) (finding four-year old child's habitual residence was Australia rather than his native country—the United States—even though he had lived there only six months, "a significant period of time for a four-year old child.").

making substantial progress.  Over the last three to six months, he has also attended church regularly, including both mass and a Bible study class with other local children.

Admittedly, there are factors that weigh against finding that T.F. is settled, including Respondent's and T.F.'s other family members' immigration status and the fact that T.F. has moved several times over the last several years.  On this first point, although Respondent's immigration status is uncertain, she is authorized to work, works on a full-time basis, and has applied for asylum for herself and T.F.  On the second point, while T.F. has lived in several homes, the Court does not find that this fact necessarily requires a finding of instability, particularly because T.F. had not yet started school when these moves occurred, and all of the moves were within Martha's Vineyard and with or close to family.  See Alcala v. Hernandez, 826 F.3d 161, 172 (4th Cir. 2016) ("In general, when all other things are equal, moving to a new home might reasonably be expected to destabilize a child's life for some period of time.  But all other things are rarely equal.  The record does not indicate that either of Mother's two moves after arriving in South Carolina was compelled by instability at the former residence.  She was not, for example, evicted or forced from a condemned apartment.  Rather, each move appears to represent part of a natural progression to an improved living situation.").

Additionally, T.F. is still learning English, which likely makes it more difficult to communicate with his schoolmates and teachers.  On the other hand, he has many family members and some classmates who also speak Portuguese, he attends weekly masses and Bible study classes in Portuguese with other children, and he has made significant strides in learning English over a relatively short time.  All of this shows that he is already settled in his environment and will only become more so as he continues to get comfortable with English.

In considering the totality of T.F.'s circumstances, the Court finds that T.F. is settled in the United States.  Having reached this conclusion, the Court next considers whether to nonetheless order T.F.'s return to Brazil.

### c.     Whether to Order Settled Child's Return

"There is very little law providing guidance as to how a district court is to weight the different factors as to return at this stage."  Yaman, 730 F.3d at 21.  "The position of the United States [as articulated in an amicus brief to the Supreme Court] is that [it] is a matter of equitable discretion."  Id. (citing Brief for the United States as Amicus Curiae in Support of Petition for Writ of Certiorari, Lozano v. Alvarez, 572 U.S. 1 (2013) (No. 12-820)).  Courts "may therefore consider the abducting parent's misconduct, together with any other relevant circumstances, such as whether return would not be harmful or disruptive even though the child has become settled, in deciding whether to order her return."  Id. (quoting Brief for the United States as Amicus Curiae in Support of Petition for Writ of Certiorari, Lozano v. Alvarez, 572 U.S. 1 (2013) (No. 12-820)); see also id. at 13 ("Even if a child is found 'now settled,' an authority retains discretion to weigh against that finding of settledness considerations such as concealment before deciding whether to order return.").  While it does appear that Respondent engaged in "misconduct" by concealing T.F.'s location from Petitioner and perhaps when procuring his passport,[7] the Court also finds that requiring T.F. to return to Brazil would be disruptive, particularly given how much of his life he has spent in the United States, his strong family connections here, and his

---

[7] Petitioner asserts that Respondent forged his signature on T.F.'s August 2019 passport application.  In support, he testified that he never signed the application.  Respondent testified that although Petitioner had previously refused to sign the application, she believed it was Petitioner's signature; she explained that an acquaintance told her that he would get Petitioner's signature, and that several days later, he returned to her with the signature.  Petitioner asked the police to look into the origin of the signature, and, as of trial, an investigation was ongoing.  The Court finds that it lacks sufficient evidence to determine whether the signature was forged or, if it was, whether Respondent knew that it was.

limited connections to his family in Brazil, other than to Petitioner.  In this case, the Court finds that the considerations related to T.F.'s well-being outweigh the policy considerations related to deterring misconduct, and will not order the return of T.F. to Brazil.[8]

## V.   CONCLUSION

Respondent has shown by a preponderance of the evidence that T.F. is well settled in the United States and the Court will not order his return to Brazil.  Accordingly, Ferreira da Costa's petition is <u>DENIED</u>.

In closing, the Court notes that T.F. appears to be a happy and well-adjusted child who is lucky enough to have two parents who love him and want him to be with them, although they disagree about where that should be.  Nothing in this decision should be understood as commentary as to which parent loves him more or would be the better parent.  The Court's decision is limited to the determination that, after spending so much of his young life in the United States, T.F. is well settled and it would therefore be disruptive to order his return to Brazil at this point.  It is the hope of the Court that Respondent and Petitioner, as parents and not litigants, can find a way to do what is best for T.F.—that is, that he be able to know and spend time with each of them without his childhood being defined or overshadowed by ongoing parental conflict.

**SO ORDERED.**

June 6, 2023                                                    /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE

---

[8] Because the Court finds that T.F. is well settled in the United States and will not order his return to Brazil, it does not reach the issue of whether his return would put T.F. at grave risk of harm.